**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHANNON M. JOHNSON, | ) | CASE NO. 1:22-CV-02272-BYP |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | BENITA Y. PEARSON |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

**I.      INTRODUCTION**

Plaintiff Shannon M. Johnson ("Ms. Johnson") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). U.S. District Judge Benita Y. Pearson has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

**II.     PROCEDURAL HISTORY**

Ms. Johnson filed applications for DIB and SSI, alleging a disability onset date of August 21, 2020. (Tr. 21, 206-07.) Her applications were denied initially and upon reconsideration. (Tr. 70-113, 121-28.) Ms. Johnson requested a hearing before an administrative law judge ("ALJ"). (Tr. 129-33.) On October 27, 2021, an ALJ held a telephone hearing due to the COVID-19 pandemic. (Tr. 41-65.) Ms. Johnson, represented by counsel, and a vocational expert ("VE") testified at the hearing.  (*Id.*) The ALJ issued a written decision on January 4, 2022, finding Ms.

1

Johnson not disabled under the Social Security Act. (Tr. 12-28.) The ALJ's decision became final on October 21, 2022, when the Appeals Council declined further review. (Tr. 1-6.) Ms. Johnson filed a Complaint challenging the Commissioner's final decision on December 19, 2022. (ECF Doc. 1.) She raises the following assignments of error:

> (1) The ALJ committed harmful error at Step Three of the Sequential Evaluation when he failed to find that Plaintiff satisfied the criteria of Listing 12.04 and/or 12.15.

> (2) The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms, including obesity, precluded her from performing substantial gainful activity on a full-time and sustained basis.

> (3) The ALJ committed harmful error when he added an incorrect definition of superficial in the RFC.

(ECF Doc. 6, PageID#782.)

### III.  BACKGROUND INFORMATION

#### A.  <u>Personal, Educational, and Vocational Experience</u>

Ms. Johnson was born in 1984, and she was 35 years on the alleged disability onset date. (Tr. 32.) She has a high school education and does not have any vocational training. (Tr. 46.) Her past relevant work was as a retail stock clerk and physical instructor. (Tr. 32.) She lives with her aunt and uncle. (Tr. 46.) She is not married and has no children. (Tr. 46-47.)

#### B.  <u>Relevant Hearing Testimony</u>

##### 1.  *Ms. Johnson's Testimony*

Ms. Johnson testified that she is unable to work because she experiences flashbacks from an attack in her apartment, has thoughts of people harming her, severe anxiety, racing thoughts, and obesity that limits her movement. (Tr. 48.) Regarding her obesity, Ms. Johnson testified that she feels pain in her knees when she walks. (*Id*.) She reported that she was not treating for her pain

and does take over the counter medication. (Tr. 48-49.) She stopped taking medications because she felt they did not work. (Tr. 49.) She testified that she can only walk five minutes before needing to sit down for approximately thirty minutes. (Tr. 49-50.) She does not use a cane. (Tr. 50.) She reported that she is able to lift only ten pounds, but she admitted that no doctor limited the amount of weight she is allowed to lift. (*Id.*) She testified that she drops items frequently and has difficulty reaching forward with her arms. (*Id.*) She stated that she can reach to pick up an item if she drops it on the kitchen table. (Tr. 51.) But she stated that she is unable to pick up an item if she drops it on the floor. (*Id.*) She also stated that she has trouble kneeling. (*Id.*)

Ms. Johnson also testified about her mental health conditions. She takes Risperdone, Buspar, and Prostatine, and she is compliant with these medications. (Tr. 51-52.) She stated that these medications generally help, the dosages for her medications have remained the same for the six months prior to her hearing, and she experiences no side effects. (Tr. 52.) She attends weekly counseling, and she reported that she finds it helpful. (Tr. 53.) She stated that she does not go outside and has not been outside for a year. (*Id.*) She testified that her mother helps her remember things. (Tr. 53.)

Ms. Johnson testified that she left her job at Walmart due to harassment. (*Id.*) She stated that managers thought she was too slow, but she believes they were "sabotaging" her. (*Id.*) She believes that this harassment stemmed from an incident where she asked Walmart personnel to keep her away from a female co-worker whose husband visited her at work because she heard that he "wasn't so nice to [the co-worker] at home." (Tr. 54.) She testified that she would not have a problem with this co-worker if the co-worker's husband did not visit the workplace. (Tr. 55.)

Ms. Johnson stated that she experiences daily flashbacks relating to a prior attack in her apartment. (Tr. 56.) She stated that her alleged harassment at Walmart made these flashbacks

worse. (*See* Tr. 57.) She testified that she avoids reminders of the two events by avoiding the public and not going outside. (*See id.*) She stated that these events make her anxious, causing her mind to race mind to race with thoughts that someone is going to hurt her or a family member. (*See* Tr. 57-58.) She stated that she has difficulty remembering any type of information because her mind is always focused on these two events. (Tr. 58.) She testified that she needs reminders from her mother to take her medication, and she has difficulty following a TV show. (Tr. 59.)

### 2. *Vocational Expert's Testimony*

The VE stated that Ms. Johnson had past work as a retail stock clerk and physical instructor. (Tr. 60-61.) The ALJ first asked whether an individual that could perform work at the light exertional level, except limited to frequently climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; frequently stooping, kneeling, crouching, or crawling; can understand, remember, and carry out simple instructions in a routine work setting with few minor changes; can respond appropriately to supervisors, co-workers, and work situations if the task performed are goal-oriented, but not at a production-rate pace; and can only have superficial interaction (no negotiating, instructing, persuading or directing the work of others and the occupation does not require tandem work or interaction with the public) could perform Ms. Johnson's past work. (Tr. 61.) The VE opined that the individual could not perform her past work but could perform other work as an officer helper/clerical assistant and motel/hotel housekeeper. (Tr. 62.) The VE stated that his testimony was consistent with the *Dictionary of Occupational Titles* ("DOT"). (*Id.*)

The ALJ asked the VE whether the same individual from the first hypothetical, except only capable of work at the sedentary exertional level, could perform work. (*Id.*) The VE opined that this individual could perform work as a document preparer, addresser and address clerk, and

4

surveillance-system monitor. (Tr. 62-63.) The VE stated that his testimony was consistent with the DOT. (Tr. 63.)

The ALJ then asked the VE whether an individual could perform work if se were off-task 20% of the time. (Tr. 63.) The VE opined that being off-task 20% of the time would be work-preclusive. (*Id.*) The ALJ also asked the VE whether an individual could perform work if she would be absent two times per month on an ongoing basis. (*Id.*) The VE opined that this would be work-preclusive. (*Id.*) The VE also testified that his testimony for these hypotheticals was consistent with the DOT. (*Id.*)

Ms. Johnson's counsel asked whether an individual that worked alone could perform the jobs opined by the VE. (Tr. 63.) The VE stated that the essential functions of the stated job would, in certain circumstances, be performed alone. (Tr. 64.) The VE stated, however, that a "need" to be alone would require the employer to implement some type of sheltered work atmosphere or accommodated work setting, which would not be consistent with competitive, unskilled work. (*Id.*) Ms. Johnson's counsel then asked whether an individual who cannot understand, remember, or carry out anything beyond one- to three-step tasks would be more consistent with sheltered or competitive work. (Tr. 64-65.) The VE opined that this restriction would be consistent with competitive, unskilled work. (Tr. 65.)

C. **Relevant Non-Medical/Medical Opinion Evidence**

1. *State Agency Opinions*

a. **Physical Limitations**

In December 2020, Dr. Dana Schultz, M.D., issued findings regarding Ms. Johnson's physical limitations at the initial level of consideration. Dr. Schultz opined that Ms. Johnson's

physical impairment of obesity was not severe. (Tr. 72.) In April 2021, Dr. Dimitri Teague, M.D., agreed with Dr. Schultz's opinion at the reconsideration level. (Tr. 88.)

### b.   Mental Limitations

In December 2020, Dr. Bonnie Katz, Ph.D., issued findings regarding Ms. Johnson's mental limitations at the initial level of consideration. Dr. Katz opined that Ms. Johnson had moderate limitations in the domains of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 72-73.) Dr. Katz opined that Ms. Johnson could understand, remember, and carry out one- to three-step tasks without need for close, sustained focus or sustained fast pace, in a solitary setting. (Tr. 74.) Ms. Johnson reported difficulty staying focused but also reported some improvement with medication. (*Id.*) Dr. Katz further opined that Ms. Johnson "would do best" working alone with infrequent, superficial interaction with coworkers and supervisors, but would not be able to deal with the public. (Tr. 75.) Dr. Katz finally opined that Ms. Johnson can carry out tasks in settings where change is infrequent – with ample time to adjust and no stringent time or production quotas in place for completion of tasks – due to symptoms related to her depression and reports of difficulty handling stress and change. (Tr. 75.) In April 2021, Dr. Courtney Zeune, Psy.D., agreed with Dr. Katz's opined limitations at the reconsideration level. (Tr. 92.)

### D.  **Relevant Medical Evidence**

#### 1.  *Physical Impairments*

On September 15, 2020, Ms. Johnson presented to an emergency department for psychiatric issues. (*See* Tr. 296). Her physical examination showed that she was morbidly obese. (Tr. 297.) She had full passive range of motion without pain and normal range of motion. (*Id.*) She had normal breath sounds. (*Id.*) Tachycardia was present. (*Id.*)

On January 21, 2021, Ms. Johnson was treated in the emergency room with complaints of low back pain in her right side. (Tr. 398.) She stated her pain was the result of an injury that occurred while she was lifting a heavy box at work 14 years ago. (*Id.*) She described her pain as sharp and stabbing, worse with movement and palpation, and better with rest. (*Id.*) She denied any numbness/tingling or weakness. (*Id.*) Her physical exam showed paraspinal tenderness to palpation. (Tr. 399-400.) Ms. Johnson's lower extremity strength was 5/5, and her lower extremity light touch was intact. (*Id.*) She was ambulating without difficulty. (Tr. 400.) Her left knee was tender to palpation throughout without obvious laxity. (*Id.*) Her left knee x-rays showed no acute left knee fracture or dislocation. (Tr. 422.) The following day, Ms. Johnson's lumbar spine x-rays showed degenerative changes but no evidence of any other problems. (Tr. 339.)

On February 3, 2021, Ms. Johnson weighed 414 pounds. (Tr. 396.) On May 3, 2021, Ms. Johnson weighed 410 pounds and had a body mass index of 70.38 kg/m2 at an office visit. (Tr. 557.)

On May 13, 2021, Dr. Samuel Onusko, M.D., treated Ms. Johnson, who complained of back and knee pain for ten years. (Tr. 566.) Dr. Onusko noted that Ms. Johnson's obesity made parts of his examination difficult but noted that Ms. Johnson had tenderness in the right lumbar paraspinal and upper buttock muscles. (Tr. 569.) She had 4/5 strength in her bilateral lower extremities, and she reported numbness over the entire aspect of her bilateral lower extremities. (Tr. 570.) Dr. Onusko suggested weight loss and physical therapy. (Tr. 570.)

On May 15, 2021, Ms. Johnson reported to the emergency room for chronic low back pain that was worsening over the last six months. (Tr. 576.) She had not yet started a physical therapy program. (*Id.*) Her provider discussed the need for weight loss because her weight "contribut[ed] to the chronic low back pain." (*Id.*) Her physical examination showed tenderness in her right

lumbar paraspinal and upper buttock muscles. (Tr. 578.) There was minimal diffuse tenderness along the lumbar spine itself but without any localizing area of point tenderness. (*Id.*) Her straight leg raise only caused muscle pain in her thighs with no radicular symptoms down her leg. (*Id.*) There was no evidence of diskitis[1] or cauda equina syndrome.[2] (Tr. 579.)

On June 14, 2021, Ms. Johnson attended a physical therapy appointment for her chronic back and knee pain. (Tr. 600.) She had an antalgic and abnormal gait due to her pain. (*Id.*)

On July 1, 2021, Ms. Johnson attended an initial visit at a weight management clinic. (Tr. 605.) Ms. Johnson reported that she was motivated to lose weight to increase her energy, improve functioning, and treat obesity-related comorbid conditions. (*Id.*) Her previous weight loss attempts included the Atkins diet, over the counter pills, and exercise, but none were successful in the long term.  (*Id.*) She was taking metformin, Lipitor, Buspar, Flexeril, Paxil, Risperdal, and Albuterol. (Tr. 606.)

On July 22, 2021, Ms. Johnson's ultrasound of her abdomen showed hepatomegaly and severe diffuse hepatic steatosis.[3]

On August 5, 2021, Ms. Johnson met with Dr. Sergio Bardaro, M.D. for a bariatric weight loss surgery consultation. (Tr. 655.) Dr. Bardaro noted that Ms. Johnson had normal gait. (*Id.*) Ms. Johnson made rocking movements during the whole interview. (*Id.*) Dr. Bardaro stated that Ms. Johnson would eventually be an acceptable candidate for surgery, but she would need another year

---

[1] Diskitis (also known as discitis) is the inflammation of an intervertebral disc or disc space often related to infections. *Discitis*, Stedman's Medical Dictionary 252160 (Nov. 2014).

[2] Cauda equina syndrome is the compression of a collection of nerve roots called the cauda equina, which provide motor and sensory function to the legs and the bladder. *See Cauda Equina Syndrome*, American Association of Neurological Surgeons, https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Cauda-Equina-Syndrome (last visited Nov. 7, 2023). Its symptoms include pain, paresthesia, weakness, and occasionally bladder and bowel sphincter dysfunction. *Cauda Equina Syndrome*, Stedman's Medical Dictionary 877880 (Nov. 2014).

[3] Hepatomegaly is enlargement of the liver. *Hepatomegaly*, Stedman's Medical Dictionary 404310 (Nov. 2014). Steatosis is fatty liver disease, a condition caused by having too much fat build up in one's liver. *See Fatty Liver Disease*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease (last visited Nov. 7, 2023).

without any psychiatric admissions and must lose weight to reach approximately 370 pounds or less. (*Id.*)

On August 7, 2021, Ms. Johnson underwent polysomnogram testing, which showed oxyhemoglobin desaturation of 82%. (Tr. 662.) She was diagnosed with severe obstructive sleep apnea, but medical providers noted that this condition was well treated with a CPAP machine. (Tr. 663.)

At a September 16, 2021, weight management session, Ms. Johnson reported that she had been trying to make changes to promote weight loss. (Tr. 716.) She reported, however, that she was not exercising due to her fear that that if she leaves her home, someone will be there when she returns. (*Id.*)

### 2. *Mental Impairments*

On September 15, 2020, Ms. Johnson presented to the emergency room with complaints of depression and suicidal ideations after being depressed for the last year. (Tr. 296.) She stated that she quit her job in August 2020. (*Id.*) She reported she bought an airline ticket to San Francisco so she could jump off the Golden Gate Bridge. (*Id.*) Ms. Johnson's psychiatric examination revealed that she had normal attention and perception; depressed mood; normal speech; normal and cooperative behavior; thought content including suicidal ideation and plan; normal cognition and memory; and impulsive judgment. (Tr. 298.) Upon evaluation, Ms. Johnson's providers determined that she should not be allowed to leave the hospital against medical advice. (Tr. 299.) She was diagnosed with depression with suicidal ideation and psychosis. (Tr. 305.) A CT of Ms. Johnson's brain showed no evidence of an acute intracranial process. (Tr. 303.) Dr. Rudawsky stated that they were able to rule out any acute intracranial processes to explain Ms. Johnson's depression or psychosis. (Tr. 306.)

Ms. Johnson was admitted to a psychiatric hospital the next day and received inpatient treatment for two weeks, *i.e.,* September 16, 2020 through October 1, 2020. The admission notes indicate that Ms. Johnson was "pleasant and cooperative, but very vague and circumstantial during the time of the interview." (Tr. 310.) She reported that she was harassed at Walmart, where she had been working in the last six months. (*Id.*) She stated that the Human Resource Department did not take her complaints seriously. (*Id.*) She also discussed an incident in 2004 where she was robbed in her apartment, and her hands were tied behind her back. (*Id.*) She was tearful talking about this event, and she reported that she has frequent memories and flashbacks of the incident but denied any nightmares. (*Id.*) She reported depressed mood, hopelessness, and helplessness, due to the alleged harassment. (*Id.*) She reported some problem with sleep, denied symptoms of mania or hypomania, and denied any other symptoms of psychosis. (*Id.*) She was diagnosed with PTSD and delusional disorder. (*Id.*) She reported that she had a twelfth-grade education. (Tr. 311.)

Her mental status examination revealed that Ms. Johnson was pleasant and cooperative; was alert and oriented to day, date, month, and year; had "okay" mood; had flat and constricted affect; was tearful at times; had goal-direct thought process with some flight of ideas and loosening of association; denied auditory/visual hallucinations; seemed to be delusional and paranoid; denied any suicidal ideation, intent, or plain; and had poor to fair insight and judgment. (*Id.*) Ms. Johnson was able to count by seven up to seventy-two, she could recall three out of three objects after three minutes, and her recent and remote memory were intact. (*Id.*) Ms. Johnson started taking Risperdal and Paxil, and her providers reported "significant improvement of her mood and delusion." (*Id.*) Her providers noted that Ms. Johnson seemed "brighter and happy," and she was spending more time out of her room, with a "pleasant and cooperative and engaging" attitude. (*Id.*) Her providers noted that she was not depressed, psychotic, manic, or suicidal. (*Id.*)

At discharge, Ms. Johnson's mental status examination revealed that she was pleasant and cooperative; was alert and oriented to day, date, month, and year; described her mood as "good"; had bright affect; had goal-directed thought process; had no flight of ideas or loosening of association; denied auditory or visual hallucination; had no noted delusions or paranoia; denied auditory or visual hallucinations; vehemently denied any suicidal ideation, intent, or plan; had fair insight and judgment; and had intact cognition. (Tr. 312.)

On November 5, 2020, Ms. Johnson had an appointment after her inpatient stay. She appeared nervous or anxious. (Tr. 353.) She was soft-spoken and had minimal eye contact but was engaged. (*Id.*) At a telehealth visit the following day, her provider noted that Ms. Johnson was cooperative, engaged, and calm with constricted range and affect and euthymic mood. (Tr. 357.) She stated that she "continues to feel social anxiety and some paranoia when leaving the house." (*Id.*) She agreed to an increase in the dosage of Paxil. (*Id.*) On December 3, 2020, Ms. Johnson met with Ms. Jacquelyn Trocano, LPC. (Tr. 315.) The counseling records showed that Ms. Johnson was again soft-spoken and had minimal eye contact. (Tr. 315.) Ms. Trocano and Ms. Johnson discussed Ms. Johnson's stressors and symptoms, as well as her maladaptive thinking patterns about ex-coworkers. (Tr. 315-16.)

On December 17, 2020, the counseling records showed that Ms. Johnson appeared nervous or anxious. (Tr. 361.) Records noted that Ms. Johnson appeared unsettled, quiet, had minimal eye contact, and was soft spoken. (*Id.*) She stated that she had difficulty the prior week due to feeling paranoid about being followed and worried she is putting her family in danger. (*Id.*) Ms. Trocano continued to discuss stressors and symptoms with Ms. Johnson, as well as challenging her maladaptive thinking patterns about ex-coworkers. (*Id.*)

On February 18, 2021, Ms. Johnson's counseling records showed that she was irritated about upcoming pool therapy, but she was eager to get back to swimming to help with her physical and mental health. (Tr. 378.) She established care at a new facility that same month. At that visit, Ms. Johnson was noted to have a normal examination, including normal gait and normal mood, memory, and judgment. (Tr. 396.)

On March 19, 2021, Ms. Johnson presented for a follow-up telehealth counseling appointment. (Tr. 528.) She reported heightened anxiety. (Tr. 529.) Her mental status exam revealed she was cooperative and engaged; had goal-directed, linear, and coherent thought process; had constricted mood and affect; had euthymic mood; denied any suicidal thoughts; had moderate insight; and had mild impairment in judgment. (Tr. 532.) Buspar was added to Ms. Johnson's medications because she became more paranoid after seeing an ex-coworker's husband at a bus stop and believed that he was following her. (Tr. 533.)

On August 27, 2021, Ms. Johnson reported she did not meet any of her goals that week due to the heat. (Tr. 471.) She reported that she saw a person outside and developed a fear of him, so Ms. Johnson and her counselor discussed that the person did not likely know her or recognize her. (*Id.*) Her counselor noted that Ms. Johnson's unreasonable fears grew exponentially because no proof was required by her to accept them. (*Id.*) She felt very comfortable living in with her family members because they all "serve[d] her." (*Id.*)

On September 17, 2021, Ms. Johnson appeared sad and depressed, which she attributed to her father's declining health and a strict diet to manage her weight and diabetes. (Tr. 465.) She was interested in getting audiobooks from the library to comfort herself. (*Id.*) She expressed fears about walking alone or near her home. (Tr. 468.)

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Johnson met the insured status requirements of the Social Security Act through December 31, 2024. (Tr. 23.) The ALJ then determined that Ms. Johnson had not engaged in substantial gainful activity since August 21, 2020, the alleged onset date. (*Id.*) The ALJ found that Ms. Johnson had the following severe impairments: degenerative changes of the lumbar and thoracic spine; obesity; obstructive sleep apnea; diabetes mellitus; depressive disorder; anxiety disorder; and posttraumatic stress disorder. (Tr. 24.) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 24-26.) The ALJ determined that Ms. Johnson could work at the light exertional level, except that she can frequently climb ramps or stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropers, or scaffolds. (Tr. 26.) With respect to her mental limitations, the ALJ determined that Ms. Johnson can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace and the work does not require more than superficial interaction. (*Id.*) The ALJ defined superficial interaction as work that does not require negotiating with, instructing, persuading, or directing the work of others, and does not require tandem work or interaction with the public. (*Id.*)

The ALJ next determined that Ms. Johnson is unable to perform any past relevant work. (Tr. 31.) Considering Ms. Johnson's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ms. Johnson could perform, such as employment as a motel housekeeper, office helper, and mailroom clerk. (Tr. 32-33.) Accordingly, the ALJ concluded that Ms. Johnson was

not disabled within the meaning of the Social Security Act since her application filing date. (Tr. 33.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported

by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

## C.  **Analysis**

### 1.  *The ALJ's Listings 12.04, 12.06, and 12.15 Analysis is Supported by Substantial Evidence.*

Ms. Johnson contends that the ALJ improperly determined that her mental conditions did not meet the criteria of Listings 12.04, 12.06, and 12.15. (*See* ECF Doc. 6, PageID#789-94.) Specifically, she contends that the record evidence and the state agency findings support that she has more than moderate limitations for the Paragraph B criteria for these Listings. (*Id.*)[4] Thus, she argues that the ALJ erred by not finding she was disabled at Step Three. (*Id.* at PageID#792.)

Ms. Johnson cites evidence in the record that, in her opinion, supports that she has more than moderate limitations in the Paragraph B criteria domains of interacting with others; concentrating, persisting, and maintain pace; and adapting and managing herself. (ECF Doc. 6, PageID#790-91.) But she fails to explain how this evidence supports her conclusion and does not link the record evidence she cites to *any* of the domains. Rather, she merely concludes that the ALJ reached the wrong conclusion, and then generally recites what she perceives to be favorable evidence. She also fails to cite to any case law to support her argument that the ALJ was compelled to reach a conclusion that she had marked or extreme limitations in these domains. Ms. Johnson has thus failed to meet the Sixth Circuit's requirement that "[w]hen a claimant alleges that [s]he meets or equals a listed impairment, [s]he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence

---

[4] Ms. Johnson, represented by counsel, also conclusorily contends that she had symptoms consistent with the "A" criteria, but her merits brief fails to provide any explanation to support this contention. (*See* ECF Doc. 6, PageID#792.) Because Ms. Johnson has failed to adequately demonstrate how the ALJ erred in this regard, I deem this argument waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Ray v. Saul*, No. 1:19-cv-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).

which describes how the impairments has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

Listings 12.04 and 12.15 incorporate identical Paragraph B and C criteria, which an ALJ uses to rate the severity of a claimant's mental impairments in four general areas of functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintain pace; and adapting and managing oneself. 20 C.F.R. Pt. 404, Subt. P, App. 1, Listing § 12.00E. Ms. Johnson's arguments focuses on the ALJ's rating for the Paragraph B criteria.

The primary issue before this Court is whether the ALJ's findings were supported by substantial evidence, not whether the evidence possibly supports a greater impairment. So long as the ALJ cites substantial, legitimate evidence to support his factual conclusions, reviewing courts may not second-guess his decision. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). The ALJ determined that Ms. Johnson had moderate limitations in all relevant "B" criteria. The ALJ provided explanations, albeit brief, with citations to the record to support his determination regarding the severity of Ms. Johnson's limitations.

With respect to interacting with others, the ALJ noted that Ms. Johnson was never married and had no children; was unemployed since August; lived with her family; had depressed mood, and flat and constricted affect at mental health appointments; and reported being harassed at Walmart where she was working in the last six months. (Tr. 25; *see* Tr. 310-11.) This evidence falls into the sort of examples that the Social Security regulations provide for the domain of interacting with others, such as cooperating with others, initiating or sustaining conversation, and understanding and responding to social cues (physical, verbal, emotional). *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, Listing § 12.00(E)(2).

Regarding Ms. Johnson's limitations for concentrating, persisting, or maintaining, pace, the ALJ pointed to evidence from Ms. Johnson's inpatient psychiatric examination where she Johnson was tearful at times, had thought process with some flight of ideas and loosening of association, was delusional and paranoid, and her insight and judgment were fair to poor. (Tr. 25; *see* Tr. 310-311.) Finally, with respect to Ms. Johnson's limitations in adapting or managing oneself, the ALJ pointed to evidence that Ms. Johnson required reminders to take her medications; felt very comfortable living in her family's home since her family members all served her; and she could wash dishes and do laundry, but it took her extra time. (Tr. 25; *see* Tr. 59, 280, 471.)

Although the ALJ's Step Three analysis is brief, a reviewing court may look elsewhere in the ALJ's decision for evidence of such findings. *See, e.g.*, *Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at * (N.D. Ohio Sept. 29, 2022) ("It's well-established that a reviewing court conducts a holistic review of the ALJ's decision and may look to findings elsewhere in the ALJ's decision to support his Step Three conclusions."); *Wright ex rel. A.B.W. v. Comm'r of Soc. Sec.*, No. 12-13564, 2013 WL 3879802, at *8 (E.D. Mich. July 26, 2013). The ALJ references his later discussion of the medical evidence to support his finding that Ms. Johnson's mental conditions do not meet or medically equal the Listing Requirements. *See* Tr. 26 ("The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.")

At Step Four, the ALJ discussed the medical evidence involving Ms. Johnson's mental impairments (including the evidence relied on at Step Three) at length. (Tr. 27-31.) The ALJ's decision revealed that Ms. Johnson required inpatient treatment for just two weeks for her mental conditions, which the ALJ cited to in his Paragraph B criteria findings. The ALJ noted that Ms. Johnson went to the emergency room for suicidal thoughts after buying an airline ticket so she

18

could jump off the Golden Gate Bridge. (Tr. 28, *see* Tr. 296.) At her psychiatric admission interview, Ms. Johnson was vague, circumstantial, and was diagnosed with delusional disorder and PTSD. (Tr. 28; *see* Tr. 298, 310.) She was tearful and constricted, and she had some flight of ideas, loosening of associations, and paranoia. (Tr. 28; *see* Tr. 298, 310.)

But the ALJ also noted other evidence that a reasonable person could conclude that the ALJ's decision was supported by substantial evidence. For example, Ms. Johnson's inpatient psychiatric stay notes indicate that she was able to count by seven up to seventy-two, her recall was 3/3 after three minutes, and her recent and remote memory were intact. (Tr. 27-28; *see* Tr. 311.) While in inpatient treatment, Ms. Johnson remained pleasant and engaging. (Tr. 27-28; *see* Tr. 310.) Significantly, the ALJ noted that Ms. Johnson's mental health improved during her two-week impatient treatment, and she was not depressed or psychotic upon discharge. (Tr. 27-28; *see* Tr. 311.) The treatment notes following her inpatient stay reflect that she was soft-spoken, had constricted affect, and had anxiety and paranoia related to others. (Tr. 28; *see* Tr. 315, 353, 358, 411.) Ms. Johnson fails to explain how any of this evidence would be inconsistent with moderate limitations at Step Three.

Ms. Johnson also relies on the state agency opinions to support her argument that she had more than moderate limitations in the domains of interacting with others; concentrating, persisting, and maintain pace; and adapting and managing oneself. (ECF Doc. 6, PageID#791.) Specifically, she points to the state agency findings that: (1) she could maintain attention, concentration, persistence, and pace for one- to three-step tasks without the need for close, sustained focus or sustained fast pace in a solitary setting; (2) she would work best alone with infrequent, superficial interaction with coworkers and supervisors; and (3) she would not be able to deal with the general public. (*Id.* (citing Tr. 74-75, 82-83, 91-100)).

As a threshold issue, Ms. Johnson offers no case law to support her argument. (*See generally id.*) But the key issue with Ms. Johnson's contention is that she overlooks the ultimate findings reached by the state agency psychologists that Ms. Johnson had *no more than moderate limitations* in any of the four Paragraph B criteria domains. (Tr. 72, 89.) The ALJ found both state agency findings to be persuasive and included the essence of those findings in his RFC determination. (Tr. 31; *see* Tr. 26.) The ALJ properly relied on the opinions of state agency reviewing psychologists to support his conclusion that Ms. Johnson did not meet or medically equal a Listing. *See Jones v. Comm'r of Soc. Sec.*, 2012 WL 946997, at *8 (N.D. Ohio Mar. 20, 2012) (An ALJ "is permitted, even encouraged, to rely on a medical expert for a professional medical analysis of whether … a claimant meets or equals a listing."); *Adkins v. Comm'r of Soc. Sec.*, No. 3:18CV388, 2019 WL 104093, at *13 (N.D. Ohio Mar. 5, 2019) ("State agency consultative opinions may constitute substantial evidence supporting an ALJ's decision.") (collecting cases).

To demonstrate that the ALJ erred regarding his Paragraph B criteria findings, Ms. Johnson had to demonstrate that no reasonable mind could have agreed with each of the ALJ's moderate limitations findings. *See Biestek*, 139 S. Ct. at 1154. But Ms. Johnson does not link any of her evidence to her disputed domains, cite any legal authority demonstrating that the ALJ was required to find a marked or extreme limitation based on her cited evidence, or offer any explanation as to how the reviewing court could reach her preferred conclusion. Her argument is also not supported by her reliance on a mere snippet of the state agency opinions, which ultimately concluded that she had no more than moderate limitations in the Paragraph B criteria domains.

Ms. Johnson relies on her hearing testimony regarding her limitations, but she similarly fails to link her testimony to any of the domains or explain how one might reach the conclusion

that she has more than moderate limitations in these domains. (*See* ECF Doc. 6, PageID#792.) And the mere recitation of self-reported symptoms does not support a limitation. *See* 20 C.F.R. §§ 404.1529, 416.929; *Rogers v. Comm'r of Soc. Sec.*, No. 1:22-cv-02085, 2023 WL 5959672, at *14 (N.D. Ohio Aug. 28, 2023), *report and recommendation adopted*, 2023 WL 5957105 (N.D. Ohio Sept. 13, 2023). Nor does she provide any case law demonstrating how these alleged limitations were inconsistent with the ALJ's moderate limitations findings. (*See* ECF Doc. 6, PageID#792.)[5]

Ms. Johnson, represented by counsel, conclusorily asserts that other evidence supports a more restrictive limitation for the Paragraph B criteria domains. But the Sixth Circuit instructs that "[u]pon a finding that there is substantial evidence to support the ALJ's findings, we must affirm, and may not 'even inquire whether the record could support a decision the other way.'" *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 466 (6th Cir. 2017), quoting *Barker v. Shalala*, 50 F.3d 789, 794 (6th Cir. 1994) (quoting *Smith v. Sec'y of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989)). Ms. Johnson must do more than lodge an underdeveloped argument listing evidence, without adequate explanation of her citations or confrontation of the key evidence cited by the ALJ, that she believes supports her position. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Furthermore, even if Ms. Johnson's argument was not waived, the ALJ's decision provides substantial evidence supporting his conclusion that she had no more than moderate limitations. Accordingly, I recommend that the Court reject Ms. Johnson's first assignment of error because it lacks merit.

---

[5] Ms. Johnson cites *Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012). *Malone* is inapposite. In *Malone*, the Sixth Circuit actually found that the ALJ's Step Three finding was supported by substantial evidence, including the medical opinion evidence. *Id.* at 472.

### 2.   *The ALJ's SSR 16-3p Analysis is Supported by Substantial Evidence*

Ms. Johnson argues that the ALJ failed to properly apply the criteria of SSR 16-3p and failed to find that the intensity, persistence, and limiting effects of her symptoms, including obesity, precluded her from performing substantial gainful activity on a full-time and sustained basis. (ECF Doc. 6, PageID#794-800.) Specifically, she takes issue with the ALJ's consideration of how her obesity interacted with her symptoms. (*Id.*) For the following reasons, this argument lacks merit.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ is not required to accept a claimant's subjective symptom complaints, however, and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003); SSR 16-3p, 2017 WL 5180304, at *6 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. *Id.* at *7-8; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

The ALJ's decision reflects that he followed SSR 16-3p's procedure for evaluating a claimant's subjective complaints. The ALJ outlined the regulatory requirements for evaluating subjective symptoms. The ALJ then described Ms. Johnson's testimony regarding her limitations. Over the course of four pages, the ALJ discussed the objective medical evidence and described Ms. Johnson's course of treatment, which included mental health treatment, pain treatment, and her statements to providers regarding how her depression, pain, and anxiety related to each other. (Tr. 27-30); *see* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms…"); 20 C.F.R. § 404.1529(c)(3)(iv)(v); SSR 16-3p, 2017 WL 5180304, at *9 ("[If] the … extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, … we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.").

Despite reciting evidence she believes support greater limitations, Ms. Johnson provides no specific, discernible argument that supports her conclusion that the ALJ failed to comply with SSR 16-3p. Nor does she cite any specific provision that she believes the ALJ overlooked under SSR 16-3p. Thus, I conclude that the ALJ's evaluation was consistent with agency rules and properly considered Ms. Johnson's combination of impairments. (Tr. 26-29.)

Here, as discussed above, the ALJ determined that Ms. Johnson's mental health treatment records suggest that she has no more than moderate limitations, and this determination aligns with the state agency findings and other evidence. The ALJ did, however, consider Ms. Johnson's physical limitations (obesity, back pain, and knee pain) and ultimately rejected the state agency findings that Ms. Johnson could perform a full range of work based on the ALJ's determination that Ms. Johnson had greater limitations. (Tr. 31.) In doing so, the ALJ noted that Ms. Johnson

23

weighed 410 pounds with degenerative changes in her spine, but also noted that her x-rays did not reveal other acute spine issues such as compression deformity or significant listhesis. (Tr. 29, 31; *see* Tr. 339.) Notably, the ALJ also discussed how Ms. Johnson presented to the emergency room with complaints of back pain, along with slightly reduced strength and tenderness around her spine. (Tr. 29; Tr. 399-400.) The ALJ also noted in June 2021 that she had a limping gait at a physical therapy appointment. (Tr. 29; *see* Tr. 600.) But the ALJ also observed that after the emergency room visit Ms. Johnson had full lower extremity strength and normal gait, including during a bariatric surgery consultation appointment. (Tr. 30; *see, e.g.*, Tr. 396, 655.)  Thus, substantial evidence supports the ALJ's finding that Ms. Johnson's subjective complaints were inconsistent with the record. *Rogers*, 486 F.3d at 241.

The ALJ also adequately considered Ms. Johnson's obesity as required by Social Security Ruling 19-2p, 2019 WL 2374244, at *4. On May 20, 2019, the Social Security Administration published SSR 19-2p, which rescinded and replaced the guidelines for evaluating obesity under SSR 02-1p. Social Security Ruling 19-2p "provides guidance on how [SSA] establish[es] that a person has a medically determinable impairment of obesity," and how the SSA "evaluate[s] obesity in disability claims." *Id.* at *1. Significantly, SSR 19-2p provides that "[t]he combined effects of obesity with another impairment(s) may be greater than the effects of each of the impairments considered separately," and that the RFC should account for "the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment." *Id.* at *4; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (noting that SSR 02-1p, the predecessor to SSR 19-2p, "directs and ALJ to consider the claimant's obesity in combination with other impairments, at all stages of the sequential

24

evaluation") (citations omitted). SSR 19-2p only requires the ALJ to "explain how [h]e reached [his] conclusion on whether obesity causes any limitations." *Id.*

The ALJ adequately considered Ms. Johnson's obesity and its impact on her symptoms as required by SSR 19-2p. In his decision, the ALJ did not explicitly mention that: (1) a medical provider attributed Ms. Johnson's back and knee pain to obesity (Tr. 570); and (2) Ms. Johnson reported at a September 2021 weight management session that she was not exercising to anxiety (Tr. 716). Ms. Johnson argues that this evidence demonstrates the "interrelationship between [her] obesity, musculoskeletal impairments, and PTSD." (ECF Doc. 6, PageID#798.) Thus, she asserts that the ALJ's lack of discussion demonstrates inadequate consideration of the totality of her impairments. (*See id.* at PageID#798-99). Ms. Johnson's argument is not well-taken.

The record supports the ALJ's assessment of the impact of Ms. Johnson's obesity. The ALJ specifically acknowledged Ms. Johnson's obesity and what SSR 19-2p entails. SSR 19-2p only requires that the ALJ consider obesity and explain the conclusion reached regarding its effects. SSR 19-2p, at \*4; *see also Montagna v. Kijakazi*, No. 20-1227-TMP, 2022 WL 565601, at \*4 (W.D. Tenn. Feb. 24, 2022). The ALJ met this requirement, stating in relevant part:

> The claimant was 410 pounds and had a body mass index of 70.38 kg/m2 (Ex. 10F/1). In the medical community, obesity is defined as a BMI of 30 or higher (SSR 19-2p). A BMI of or over 40 is generally considered Level III or "extreme" obesity. Level II obesity carries the greatest risk of developing obesity-related impairments. Pursuant to SSR 19-2p, the undersigned has considered the limiting effects of the claimant's obesity. This includes that the combined effects of obesity with another impairment may be greater than the effects of each of the impairments considered separately.

(Tr. 30.)

Reading the ALJ's decision as a whole and with common sense, the ALJ's decision reflects that he considered Ms. Johnson's obesity and its limiting effects. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the Secretary's findings must be based

on the record as a whole."); *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.") For example, the ALJ noted that Ms. Johnson weighs over 410 pounds, has a BMI of 70.38 (Tr. 30; *see* Tr. 557), and that a medical provider had difficulty inspecting Ms. Johnson's spine due to her size. (Tr. 29; *see* Tr. 570.) But the examination nonetheless showed tenderness of the L4-S1 spinous processes with no evidence of spasm and 4/5 strength in her bilateral lower extremities. (Tr. 29; *see* Tr. 569-70.) The ALJ discussed Ms. Johnson's attempts to lose weight. (Tr. 29; *see* Tr. 605 (initial weight loss clinic appointment); Tr. 655 (bariatric weight loss surgery consultation).) He also discussed a counseling appointment where Ms. Johnson appeared sad and depressed, which she attributed, in part, to her strict diet to manage her weight and diabetes. (Tr. 30; *see* Tr. 465.) At that same appointment, she expressed fears about walking alone or near her home. (Tr. 465.)

The ALJ also referred to Ms. Johnson's obesity again when he explained that he found Ms. Johnson more limited than the state agency findings that Ms. Johnson could perform a full range of work. In determining that the state agency findings were unpersuasive, the ALJ specifically referenced Ms. Johnson's obesity in reaching his conclusion that the evidence "supported that [she] had severe physical limitations that limited her to less than a full range of light work." (Tr. 31.) As demonstrated above, the ALJ's decision reflects that the ALJ adequately considered Ms. Johnson's obesity separately and in conjunction with her other impairments.

Ms. Johnson's argument that it "was error for the ALJ to disregard these findings which would preclude her from standing/walking the [six] hours a day as required for work at the light level of exertion" is not well-taken. (*See* ECF Doc. 6, PageID#797-99.) Her argument does not present evidence beyond her own testimony to demonstrate that her obesity and anxiety impose greater limitations that prevent her from standing/walking six hours per day. (*See generally id.*) In

addition, she fails to cite any case law demonstrating that her cited evidence requires the ALJ to find that she was unable to perform full time work. (*Id.*)

Ms. Johnson's merits brief argument merely reiterates the record, including her testimony, function report, inpatient mental health treatment, emergency room treatments for back pain, mental health treatment, and weight—and the majority of this evidence was discussed and weighed by the ALJ in his RFC assessment. (*See generally* Tr. 26-31.) Ms. Johnson, as the Commissioner contends, appears to have "grafted a *post hoc* argument that she cannot work full time based on these facts." (ECF Doc. 8, PageID#819.) At best for Ms. Johnson, she presents an alternative interpretation of the evidence. But a mere feasible alternative interpretation of the evidence does not demonstrate a basis for a remand because, as stated above, Ms. Johnson has the burden to demonstrate that no reasonable person could have reached a different conclusion. *Fleischer*, 774 F.Supp.2d 875. She fails to meet this burden.

In sum, Ms. Johnson fails to demonstrate that no reasonable person could have agreed with the ALJ's findings. Here, the ALJ's decision reflects that he specifically addressed Ms. Johnson's combination of impairments and her obesity. A reasonable person could conclude that Ms. Johnson's complaints about her pain, anxiety, and obesity are not consistent with the record. *Biestek*, 139 S. Ct. at 1154. Ms. Johnson fails to establish that the evidence she cites, which was mostly discussed by the ALJ in his RFC assessment, demonstrates that the ALJ erred. And a reviewing court cannot craft an argument for Ms. Johnson that she failed to articulate. Ms. Johnson is "essentially asking this Court to reweigh the evidence and issue a *de novo* determination." *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at *8 (N.D. Ohio June 18, 2015). But the Court cannot do so. "Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion." *See Key v. Callahan*,

109 F.3d 270, 273 (6th Cir. 1997). The Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Accordingly, I recommend that the Court reject Ms. Johnson's assignment of error.

### 3.  *The ALJ Did Not Improperly Expand the Definition of Superficial.*

Ms. Johnson argues that the ALJ erred because he added an "incorrect" definition of superficial interaction in his RFC determination. (ECF Doc. 6, PageID#800.) Specifically, she contends that the RFC provided an "unsupported definition/limitation to [her] ability to perform superficial interactions." (*Id.* at PageID#800-01.) She argues that a court in the Southern District of Ohio has determined that superficial contact goes to the quality of interactions. (*Id.* at PageID#801 (citing *Hutton v. Comm'r of Soc. Sec.*, No. 2:20cv339, 2020 WL 3866855, at *4 (S.D. Ohio July 8, 2020)). She further asserts that a court within the Northern District of Ohio explained that superficial interactions would exclude interactions requiring thoroughgoing, in-depth, comprehensive, or detailed interactions. (*Id.* (citing *Metz v. Kijakazi*, No. 1:20-cv-2202, 2022 WL 4465699, at *9 (N.D. Ohio Sept. 26, 2022)). Accordingly, she contends that the ALJ's RFC definition of superficial as "not requir[ing] with, instructing, persuading, or directing the work of others, and the occupation does not require tandem work or interaction with the public" (Tr. 26) was an inaccurate expansion of the definition of superficial. (ECF Doc. 6, PageID#801.)

Ms. Johnson also argues that the ALJ's superficial definition and RFC limitations were contrary to the state agency opinions. Specifically, she contends that the state agency psychologists opined the following: (1) that Ms. Johnson could maintain attention, concentration, persistence, and pace for one to three-step tasks without the need for close sustained focus or sustained fast pace in a solitary setting; and (2) Ms. Johnson would "work best" alone with infrequent, superficial

interaction with coworkers and supervisors and would not be able to deal with the public. (*Id.* (citing Tr. 64-65, 82-83, 91, 100.) Thus, she contends that the ALJ's definition of the term superficial was contrary to the state agency opinions and was harmful, because the testimony of the VE was based on this definition and not the "limiting application of superficial interaction with others as defined by the Courts." (*Id.*)

As a threshold matter, there is no definition for the term "superficial interaction" in the *Dictionary of Occupational Titles*. *See Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-2370, 2022 WL 721455, at \*16 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted*, 2022 WL 716105 (N.D. Ohio Mar. 10, 2022); *see also James v. Comm'r of Soc. Sec.*, No. 1:22-CV-1915, 2022 WL 4172932, at \*20 (N.D. Ohio June 5, 2023); *Betz v. Comm'r of Soc. Sec.*, No. 3:21-CV-2408, 2022 WL 17717496, at \*10 (N.D. Ohio Nov. 8, 2022); *Adams v. Comm'r of Soc. Sec.*, No. 1:22-CV-01765-DAC, 2023 WL 4685368, at \*9 (N.D. Ohio July 21, 2021). A limitation to superficial interaction, however, suggests a limitation related to the quality or nature of the interaction. *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-cv-18, 2018 WL 625473, at \*4 (S.D. Ohio Nov. 30, 2018), *report and recommendation adopted*, 2019 WL 133166 (S.D. Ohio Jan. 8, 2019); *Redd v. Comm'r of Soc. Sec.*, No. 1:20-cv-222, 2021 WL 1960763, at \*4 (W.D. Mich. May 17, 2021).

To support her argument that the ALJ erred in how he defined "superficial interaction," Ms. Johnson cites two cases for the proposition that superficial interaction is qualitative. (ECF Doc.6, PageID#100 (citing *Hutton v. Comm'r of Soc. Sec.*, No. 2:20cv339, 2020 WL 3866855, at \*4 (S.D. Ohio July 9, 2020) and *Metz v. Kijakazi*, No. 1:20cv2202, 2022 WL 4465699, at \*9 (N.D. Ohio Sept. 26, 2022)). *Hutton* is distinguishable. In that case, a court in the Southern District of Ohio remanded an ALJ's decision where the ALJ entirely excluded "superficial" from the RFC

finding. *Hutton*, 2020 WL 3866855, at *5 ("Rather, the problem here is that the ALJ's discussion reveals that he failed to even consider whether Plaintiff did, in fact, require a limitation to only superficial interaction because he incorrectly concluded that such a limitation is either vague or was otherwise accommodated by limiting Plaintiff to only occasional interaction."). Unlike *Hutton*, the ALJ here explicitly included "superficial" in his RFC finding.

*Metz* is also distinguishable because that court merely pointed out that a limitation to superficial interaction "reasonably encompasses" anything beyond "brief interactions." 2022 WL 4465699, at *9. Thus, Ms. Johnson fails to establish that the ALJ improperly expanded the definition of "superficial." *Harcula v. Comm'r of Soc. Sec.*, No. 1:22-CV-01950-CEF, 2023 WL 6050291, at *15 (N.D. Ohio Aug. 31, 2023), *report and recommendation adopted*, 2023 WL 6049326 (N.D. Ohio Sept. 15, 2023) (rejecting claimant's argument that the ALJ improperly expanded the definition of superficial interaction by including a limitation of no arbitration, negotiation, confrontation, or being responsible for the safety or supervision of others, in part, because claimant "d[id] not cite any other legal authority or present a persuasive argument to the contrary").

Ms. Johnson also argues that the ALJ improperly expanded his definition of "superficial" from the state agency findings, which suggested a different variation of the word. Specifically, the state agency findings indicated Ms. Johnson should perform "solitary" work and "[w]ould do best working alone with infrequent, superficial interaction with coworkers and supervisors but would not be able to deal with the public." (Tr. 75, 83.) As a threshold issue, Ms. Johnson offers no case law to support her proposition or guide this Court's inquiry.

A more troubling issue, however, is that binding case law suggests that Ms. Johnson's contention is incorrect.  That is because even where an ALJ provides "great weight" to a medical

opinion, there is no requirement that an ALJ adopt the verbatim language of persuasive medical opinions. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (noting that an ALJ is not required to adopt each restriction of an expert to which he gave great weight); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, at *11 (N.D. Ohio Mar. 19, 2013) ("Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight."), *aff'd* (6th Cir. 13-2578 Jan. 30, 2014) ("While Smith contends otherwise, there is no requirement that an ALJ adopt the entirety of a state expert opinion, even if affording it significant weight, or that the ALJ provide an explanation for why certain limitations proposed by the expert were not incorporated into his residual functional capacity assessment.").

The more relevant inquiry here is whether the facts in this case demonstrate that the RFC assessment is not supported by substantial evidence. *See Daniels v. Comm'r of Soc. Sec.*, No. 3:19-CV-02946, 2020 WL 6913490, at *10 (N.D. Ohio Nov. 24, 2020). Ms. Johnson does not demonstrate or argue how the evidence merits different limitations than those articulated in the RFC assessment. The ALJ extensively discussed the record in his RFC assessment portion of the ALJ's decision. (Tr. 26-31.) This evidence includes consideration of Ms. Johnson's ability to interact with others. For example, despite Ms. Johnson's paranoia, she was able to interact with providers. Without any explanation from Ms. Johnson suggesting otherwise, it was reasonable for the ALJ to have defined "superficial" in the manner he did and to limit Ms. Johnson to superficial interaction. Accordingly, Ms. Johnson's third assignment of error is not well-taken.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: November 9, 2023                              _s/ Jennifer Dowdell Armstrong_
                                                 Jennifer Dowdell Armstrong
                                                 U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

_Id._ (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. _Berkshire v. Beauvais_, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. _Howard v. Sec'y of Health and Hum. Servs._, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same

argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d 505). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).